OPINION
{¶ 1} Lamar D. Florence was found guilty by a jury in the Montgomery County Court of Common Pleas of aggravated murder, kidnapping, murder, and having a weapon while under disability, each with a firearm specification. The trial court sentenced Florence to life imprisonment for the aggravated murder, five years for kidnapping, and fifteen years to life for murder, all to be served concurrently. Additionally, the court imposed a three year term of imprisonment for possessing a weapon under disability and an additional three years of actual incarceration on the firearm specifications, both to be served consecutively with the other sentences. Florence appeals.
 {¶ 2} The state's evidence established the following.
 {¶ 3} Sheri Shehee had been involved in sexual relationships with both Florence and the victim, Steven Mayberry. She had known Florence for eight years and had dated him on and off during that time. They had a five year old son who lived with Shehee. Although Florence did not live with Shehee in March 2003, she testified that their relationship was "on" at that time. Shehee had also known Mayberry for about eight years. The men knew each other enough to recognize one another. According to Shehee, in March 2003, Mayberry knew that Shehee was involved with Florence, but Florence did not think that Shehee was involved with Mayberry. Florence did know that Shehee and Mayberry had had a sexual relationship in the past. Shehee also stated that Florence was involved with other women at this time and that Mayberry was married.
 {¶ 4} Shehee was uncooperative with the prosecution of the case against Florence. Because a material witness warrant had been issued, Shehee's deposition was taken, at her request, on February 11, 2004. The trial judge was present at the deposition. Shehee also testified at trial. She presented substantially different versions of events on these two occasions, although the basic framework of the events was the same.
 {¶ 5} Shehee testified that, in the early evening of March 6, 2003, Florence came to her house at 1331 Swisher Avenue in Dayton to pick up their son and to take him to his grandmother's house because Shehee had to be at work very early the next morning. After dropping off their son, Florence returned to the house, and he and Shehee had a brief conversation about having sex. Shehee indicated to Florence that she was not interested, and he left after a little bit of argument. Shehee talked to Mayberry on the telephone later that evening, then went to sleep.
 {¶ 6} Mayberry showed up at Shehee's house sometime after she had gone to bed. When she let him in, he reported that Florence was outside. Shehee confirmed this by looking out the window. She saw Florence standing by his car, smoking and shaking his head.
 {¶ 7} According to Shehee's testimony at trial, she told Mayberry to wait upstairs while she went downstairs, expecting to talk with Florence through her door. Instead, she heard Florence putting a key into the lock. She had not believed that he had a key to the house because he was not living there at that time. Fearful about the fact that Florence was entering the house, Shehee hid in a corner behind a television while Florence entered and headed upstairs. Shehee then grabbed Florence's keys, which he had left in the door, and ran outside wearing only her robe. She used the keys to drive Florence's car to a friend's house because the keys to her own car had been upstairs in the bedroom.
 {¶ 8} When Shehee arrived at her friend Tyleah Davis's house a few minutes later, she called Florence to see what had happened with Mayberry. He sounded upset and anxious, and he wanted to know where she was. He would not answer Shehee's questions about what had happened. Shehee hung up on Florence and called Mayberry's cell phone, getting no answer. She testified that she did not call the police at this point because she did not think there was any need to do so. She borrowed some clothes from her friend, then headed to her aunt's house.
 {¶ 9} Shehee attempted to convince one of her cousins to come back to the house with her because she feared an altercation with Florence. When the cousin was initially unwilling to go, Shehee told him that Florence had pistol-whipped Mayberry. Shehee then drove near the house to see if Mayberry's car was still where he had parked it earlier. She saw that it was, but that her car was gone.
 {¶ 10} With another cousin's help, Shehee later returned Florence's car to his house. When Shehee called Florence again, he continued to ask where she was. After returning Florence's car, Shehee went to her mother's house. At this point, Shehee was scared, stunned, crying, and upset. Her mother called 911, and they reported to the operator that Florence had hit Mayberry and that they were worried about what else might have happened at the house. Two to three hours had elapsed from the time that Shehee fled the house until the time that she and her mother called 911.
 {¶ 11} Throughout her trial testimony, Shehee maintained that she had not seen either man with a gun the night of the shooting and that she had not seen any altercation between Florence and Mayberry.
 {¶ 12} In her videotaped deposition, she had given a very different account of events, which was consistent with the accounts she had given to the 911 operator and to detectives on earlier occasions. After the state indicated that it had been surprised by Shehee's testimony at trial, it was permitted to play the deposition testimony for the jury at trial.
 {¶ 13} According to the deposition testimony, the trouble similarly began when Mayberry arrived at Shehee's house and told her that Florence was outside. After Shehee looked out the window, she and Mayberry had been heading out of her bedroom on the second floor when Florence came up the stairs. Florence had a gun and tapped it several times on Mayberry's temple, motioning with his head that Mayberry should go back into the bedroom. Shehee recognized this gun as a Desert Eagle that Florence always carried. Mayberry backed up onto the bed while trying to calm Florence down. When Florence hit Mayberry in the head with the pistol, Shehee ran from the room, down the stairs, and out to Florence's car. She heard Mayberry say, "Man, I don't got nothing" as she fled. Shehee testified at her deposition that Mayberry had been lying on the bed when she left and that Florence would not have permitted him to leave. Shehee stated that Mayberry had not had a gun, that he had done nothing aggressive toward Florence, and that his only movement had been to cover his face with his hands. Shehee said in her deposition that, when she had called Florence after fleeing the house, he had told her to "cut the small talk" and come back to help him get rid of the body.
 {¶ 14} Shehee's versions of events converge again after she has fled from her house. She went to the home of a friend for clothes, and then managed to return Florence's car to his house with the help of a cousin. She also verified that Mayberry's car was still at her house by driving nearby. Over a period of a couple of hours, Shehee made several calls to the cell phones of Florence and Mayberry, never getting an answer from Mayberry. The friends and family members that Shehee encountered during this period found her to be very upset and showing various signs of distress, including shaking, crying, and an inability to react normally. Finally, Shehee's mother called the police and reported the possibility of a serious altercation at 1331 Swisher.
 {¶ 15} Officer Estrellado arrived at the scene in response to the 911 call. As he approached the house from up the street, he saw Florence moving toward the street looking both ways. When Estrellado ordered him to stop, Florence did not immediately do so. He continued to move toward the street, angling his body away from the officer as if to hide something. Estrellado saw a glint of something metallic at Florence's left side. When Florence reached a car along the street, Estrellado heard a "metallic clank" that he believed to be a gun hitting the ground. From that point on, Florence was cooperative. Estrellado testified that there had been a "messy" bloody residue on the back of Florence's pants, as well as a bloody residue on his hands. Estrellado retrieved a Desert Eagle handgun from the spot where Florence had been standing when Estrellado heard the "clank." The gun was cocked and ready to fire. Police officers found Mayberry's partially clothed body in the upstairs bedroom of the house shortly thereafter, with a gunshot wound to the back of the head, among other injuries.
 {¶ 16} Forensics experts determined that the Desert Eagle was the gun that had inflicted Mayberry's fatal wound, and that the gun had been in contact with Mayberry's skin when it was fired. Mayberry's blood was found on the weapon and on the steering wheel and gear shift of Shehee's car, which had been parked nearby.
 {¶ 17} Florence testified on his own behalf at trial. He stated that, when he had returned to Shehee's house and come upstairs, Mayberry had been "agitated," "excited," and "aggressive," and had pulled a gun from his coat pocket. He testified that the two men had wrestled over the gun and that it had fired accidentally during the struggle. He testified that he did not call the police because he did not think they would believe him due to his felony record. He called Shehee and asked, "Why didn't you stop him?" He left the house in Shehee's car, but returned a short time later, shook the victim, and said "You can't be dead." Then he went outside and encountered Officer Estrellado. Florence testified that he had not meant for Mayberry to die. He stated that Mayberry had been falling sideways when the gun "went off by itself one time." On cross-examination, Florence was unable to explain why he had felt the need to get rid of the gun if it had gone off accidentally and why the victim's pants had been partially removed.
 {¶ 18} Florence was indicted on two counts of aggravated murder, kidnapping, aggravated robbery, and possession of a weapon while under disability, each with a firearm specification. The charges against Florence were tried to a jury on March 15-20, 2004. He was found guilty of one count of aggravated murder (while committing or attempting to commit a kidnapping), as well as kidnapping and possession of a weapon while under disability. He was found not guilty of aggravated robbery. On the second count of aggravated murder (while committing or attempting to commit an aggravated robbery), Florence was found guilty of the lesser included offense of murder. He was sentenced as described supra.
 {¶ 19} Florence raises seven assignments of error on appeal. Because it is potentially dispositive of all of the other assignments of error, we will first address Florence's seventh assignment of error related to his right to a speedy trial.
 {¶ 20} VII "THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND VIOLATED APPELLANT'S RIGHT TO DUE PROCESS OF LAW BY FAILING TO PROVIDE APPELLANT A TRIAL WITHIN THE TIME PRESCRIBED BY LAW."
 {¶ 21} R.C. 2945.71 provides that a person against whom a felony charge is pending must be brought to trial within 270 days of his arrest and that, if he is held in jail in lieu of bail on the pending charge, each day shall be counted as three days. R.C. 2945.71(C)(2) and (E). These time limits may be extended for the reasons set forth in R.C.2945.72.
 {¶ 22} Florence remained in jail throughout these proceedings. He cites the three-for-one provision of R.C. 2945.71(E) in his brief, although his argument does not suggest that this provision applied to him. The state claims, and the trial court found, that Florence was held in jail on a parole violation as well as the pending charges and therefore was not entitled to the benefit of the three-for-one provision. See State v. Brown (1992), 64 Ohio St.3d 476, 479-80,597 N.E.2d 97. Florence did not object to the trial court's finding that he was held on other charges in that court or on appeal. As such, we will apply the 270 day rule.
 {¶ 23} Florence argues that, even accounting for time that he waived, his trial began more than 300 days after his arrest. The state asserts that the there was no speedy trial violation if the extensions permitted by R.C. 2945.72 are taken into account.
 {¶ 24} Florence was arrested on March 14, 2003. He initially pled not guilty but changed his plea to not guilty by reason of insanity on April 17, 2003, at which time he also requested a psychological evaluation. During the elapsed time, thirty-one days counted against the state.
 {¶ 25} Pursuant to R.C. 2945.72(B), "[a]ny period during which the accused is mentally incompetent to stand trial or during which his mental competence to stand trial is being determined" extends the time for speedy trial purposes. Florence was found competent to stand trial on August 27, 2003. Thus, the period from April 17 through August 27, 2003, was tolled.
 {¶ 26} Five more days counted against the state before Florence filed his Speedy Trial Time Waiver on September 2, 2003. The parties dispute whether Florence withdrew his waiver on October 31 or on November 3, 2003, and this fact cannot be determined from the record. Because this discrepancy will not be significant, we need not resolve it, and we will use October 31 for purposes of our calculations. None of this time counted against the state. The trial began 136 days after Florence withdrew his waiver of speedy trial time. Based on this timeline, we conclude that, for speedy trial purposes, 172 days had elapsed from the time Florence was arrested until the time he was brought to trial.
 {¶ 27} Thus, he was not denied his right to a speedy trial.
 {¶ 28} The seventh assignment of error is overruled.
 {¶ 29} I. "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT AND IN VIOLATION OF HIS RIGHTS TO DUE PROCESS OF LAW UNDER THE UNITED STATES AND OHIO CONSTITUTIONS AND HIS RIGHT TO CONFRONTATION UNDER THE SIXTH
AMENDMENT AND ARTICLE I, SECTION 10, OHIO CONSTITUTION 6 WHEN IT PERMITTED THE ADMISSION OF PREJUDICIAL HEARSAY."
 {¶ 30} Florence claims that the trial court improperly allowed hearsay testimony regarding Shehee's statements on the night of Mayberry's death. The statements were allowed pursuant to the excited utterance exception to the hearsay rule, Evid.R. 803(2).
 {¶ 31} Hearsay is defined as "a statement, other than one made by the declarant at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay generally is not admissible as evidence, but certain exceptions exist as set forth in Evid.R. 803. Evid.R. 803(2) sets forth the excited utterance exception, which provides that a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule.
 {¶ 32} The rationale for admitting hearsay statements pursuant to the excited utterance exception is that the declarant is unable, due to the startling event, to reflect on the statement sufficiently to fabricate it. In re Nooks, Montgomery App. No. 19374, 2002-Ohio-5824, ¶ 13. See, also, State v. Wallace (1988), 37 Ohio St.3d 87, 88, 524 N.E.2d 466. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may not be a result of reflective thought. State v. Taylor (1993),66 Ohio St.3d 295, 300-301, 612 N.E.2d 316. The determination of whether a hearsay declaration should be admitted as an excited utterance is a matter within the trial court's sound discretion. Roach v. Roach (1992),79 Ohio App.3d 194, 205, 607 N.E.2d 35.
 {¶ 33} Linda Baldwin, Shehee's cousin, testified that Shehee woke her up on the night of March 7, 2003, and that, at the time, Shehee was anxious, hysterical, and nervous, and that she was crying, pacing, shaking, and speaking unclearly. Shehee wanted Baldwin to follow her to Florence's house and reported that Florence had killed Mayberry after pistol-whipping him. Baldwin testified that she had never before seen Shehee in a condition like that . Shehee's mother, Ruth Williamson, similarly testified that Shehee had been unable to get out of the car, had been shaking and crying and had been visibly upset and hysterical in a way that Williamson had never observed when she stated that she thought Mayberry was dead. Shehee likewise testified that she had been afraid, stunned, upset, and crying.
 {¶ 34} Florence claims that Shehee had had time "to reflect, formulate, execute plans, and consider what she said" prior to making these statements, which took them outside the excited utterance exception to the hearsay rule. He relies heavily on the fact that some of the statements were made as much as two to three hours after the time Shehee fled the house on Swisher.
 {¶ 35} "There is no per se amount of time after which a statement can no longer be considered to be an excited utterance. * * * Therefore the passage of time between the statement and the event is relevant but not dispositive of the question." Taylor, 66 Ohio St.3d at 303. Based on the evidence presented, the trial court reasonably concluded that Shehee's statements to Baldwin, Williamson, and the 911 operator fell within the excited utterance exception. Baldwin and Williamson had each known Shehee for her entire life, and both stated that they had never before seen her behave as she did the night of the shooting when she recounted what she suspected had happened. She also exhibited typical signs of distress, such as crying and shaking. This behavior evinces that Shehee was still under the stress of excitement caused by the startling events when she made the statements at issue.
 {¶ 36} Florence also mentions the testimony of Officer William Zlholz in his argument about improper exceptions to the hearsay rule under the excited utterance exception. We note that the hearsay rule and its exceptions were not relevant to Zlholz's testimony because he did not testify as to the substance of any of Shehee's statements.
 {¶ 37} At oral argument, Florence raised an additional hearsay argument for the first time. He claimed that Shehee's testimony in her deposition that Mayberry had said, "Man, I don't got nothing" as Florence attacked him was inadmissible hearsay. The state claims that this evidence was admissible under the excited utterance exception and that the admission of this evidence was in conformity with Crawford v.Washington (2004), 541 U.S. 36, 124 S.Ct. 1354.
 {¶ 38} We will assume, for the sake of this argument, that Mayberry's statement was hearsay, although this fact is difficult to ascertain because the meaning of the statement is unclear. If the statement was hearsay, we have no problem concluding that it fell within the excited utterance exception as, under both the state's and Florence's versions of events, Mayberry was embroiled in a heated, armed confrontation when the statement was made. The state correctly points out that the holding inCrawford does not preclude the use of excited utterances; rather, it limits the use of testimonial statements of a witness who does not appear at trial. In our judgment, Mayberry's statement should not be characterized as testimonial. See Crawford, 124 S.Ct. at 1364-1365, 1374. Thus, the testimony about Marberry's statement was not improper.
 {¶ 39} The first assignment of error is overruled.
 {¶ 40} II. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW BY FAILING TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF VOLUNTARY MANSLAUGHTER."
 {¶ 41} Florence challenges the trial court's failure to instruct the jury on voluntary manslaughter, which he characterizes as a lesser included offense of murder. Florence concedes that he did not request such an instruction, but he claims that it was plain error for the court not to give the voluntary manslaughter instruction.
 {¶ 42} Aggravated murder and murder differ from voluntary manslaughter in that the perpetrator of a voluntary manslaughter causes the death of another while acting under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force. R.C. 2903.03(A). Voluntary manslaughter is an inferior degree of aggravated murder, for "its elements are * * * contained within the indicted offense, except for one or more additional mitigating elements * * *." State v. Tyler (1990),50 Ohio St.3d 24, 36, 553 N.E.2d 576, citing State v. Deem (1988),40 Ohio St.3d 205, 209, 533 N.E.2d 294. Voluntary manslaughter is not a lesser included offense of murder, but the test for whether a judge should give a jury an instruction on voluntary manslaughter when a defendant is charged with murder is the same test to be applied as when an instruction on a lesser included offense is sought. Id. at 37.
 {¶ 43} A defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter. Id.; Deem, 40 Ohio St.3d at 211. When the evidence presented at trial going to a lesser included offense or inferior-degree offense meets this test, the trial judge must instruct the jury on the lesser or inferior-degree offense. State v. Loudermill
(1965), 2 Ohio St.2d 79, 31 O.O.2d 60, 206 N.E.2d 198, syllabus. On the other hand, when the evidence presented at trial does not meet this test, a charge on the lesser included or inferior-degree offense is not required. State v. Kidder (1987), 32 Ohio St.3d 279, 282-283,513 N.E.2d 311. A defendant on trial for murder or aggravated murder bears the burden of persuading the fact finder, by a preponderance of the evidence, that he should be convicted of voluntary manslaughter rather than murder or aggravated murder. State v. Rhodes (1992),63 Ohio St.3d 613, 619, 590 N.E.2d 261.
 {¶ 44} An inquiry into the mitigating circumstances of provocation must be broken down into both objective and subjective components. Statev. Shane (1992), 63 Ohio St.3d 630, 634, 590 N.E.2d 272. In determining whether the provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied. Then, if that standard is met, the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage. Id. If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction. In that event, the objective portion of the consideration is not met, and no subsequent inquiry into the subjective portion, when the defendant's own situation would be at issue, should be conducted. Id.
 {¶ 45} In Florence's case, the trial court could have reasonably concluded that Florence had not satisfied the objective element of voluntary manslaughter: that provocation had been reasonably sufficient to bring on sudden passion or a fit of rage. This was not a situation in which Florence had suddenly come upon his girlfriend in bed with another man. Florence had apparently seen Mayberry arrive at the apartment only moments before the attack. The trial court could have reasonably concluded that Mayberry's arrival at Shehee's house, without more, was insufficient to reasonably justify a fit of rage that was sufficient to incite the use of deadly force. Accordingly, it was not plain error for the trial court to refuse to instruct on voluntary manslaughter.
 {¶ 46} The second assignment of error is overruled.
 {¶ 47} III. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AND A FAIR TRIAL WHEN IT FAILED TO INSTRUCT THE JURY ON THE AFFIRMATIVE OFFENSE OF SELF-DEFENSE."
 {¶ 48} Florence claims that he presented sufficient evidence which, if believed, would have supported the affirmative defense of self-defense. Thus, he claims that the trial court erred in refusing to instruct the jury on self-defense.
 {¶ 49} A person's use of force in self-defense is necessarily a purposeful act. Implicitly, then, force that occurs accidentally does not qualify to be treated as self-defense. State v. Marbury, Montgomery App. No. 19226, 2004-Ohio-1817, ¶ 16. In other words, the defenses of accident and self-defense are mutually exclusive concepts. State v.Barnd (1993), 85 Ohio App.3d 254, 260, 619 N.E.2d 518.
 {¶ 50} The trial court properly refused to instruct on the mutually exclusive defenses of accident and self-defense. According to Florence's version of events, he shot Mayberry accidentally, not purposefully. As such, the trial court's instruction on accident was the appropriate instruction to give.
 {¶ 51} The third assignment of error is overruled.
 {¶ 52} IV. "APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, AND DUE PROCESS OF LAW IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND UNDER ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."
 {¶ 53} Florence claims that he was denied the effective assistance of counsel in several respects. We review these claims under the two prong analysis set forth in Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674, and adopted by the Supreme Court of Ohio in State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.
 {¶ 54} These cases stand for the proposition that, to reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. Strickland, 466 U.S. at 688.
 {¶ 55} First, Florence claims that counsel was ineffective in failing to request jury instructions on voluntary manslaughter and self-defense. As we discussed under the second and third assignments of error, neither of these instructions was warranted by the evidence. Thus, counsel was not ineffective in failing to request these instructions.
 {¶ 56} Second, Florence claims that counsel was ineffective in requesting a lesser included offense instruction on negligent homicide, which is not, in fact, a lesser included offense of murder. Florence claims that counsel's reliance on negligent homicide as a lesser included offense "left [him] without a defense."
 {¶ 57} Florence correctly observes that negligent homicide is not a lesser included offense of murder. State v. Koss (1990), 49 Ohio St.3d 213,219, 551 N.E.2d 970; State v. Lollis (Mar. 3, 1993), Clark App. No. 2897. However, we do not see how Florence could have been prejudiced by counsel's request for — and the trial court's denial of — an instruction that was not warranted. Moreover, Florence was not left without a defense because the trial court instructed on the defense of accident, which was the only defense supported by the evidence. As such, Florence was not denied the effective assistance of counsel with respect to the jury instructions.
 {¶ 58} Finally, Florence claims that counsel was ineffective in failing to object to the admission of hearsay evidence. As discussed under the first assignment of error, we have found that the statements at issue fell within the excited utterance exception to the hearsay rule, and thus were properly admitted into evidence. Counsel was not ineffective in failing to object to the use of these statements.
 {¶ 59} The fourth assignment of error is overruled.
 {¶ 60} V. "APPELLANT WAS DENIED DUE PROCESS OF LAW AND HIS RIGHT TO A FAIR TRIAL IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO THE UNITED STATES CONSTITUTION WHEN THE PROSECUTION COMMITTED PROSECUTORIAL MISCONDUCT BY KNOWINGLY USING PERJURED TESTIMONY."
 {¶ 61} Under this assignment of error, Florence asserts that the prosecutors engaged in misconduct by knowingly presenting false or perjured testimony at trial. Specifically, Florence seems to object to the use of Shehee's deposition testimony, which was taken prior to trial. He claims that "the evidence of record demonstrates the prosecution knew Ms. Shehee's testimony was false."
 {¶ 62} Florence's argument seems to be based on two premises: 1) all of Shehee's pretrial accounts of the events of March 6 and 7, 2003, including her statements to family, friends, and police officers, as well as her deposition testimony, were false; and 2) the prosecutors knew that these statements were false. The record does not support either of these conclusions. It is clear that the state was surprised by Shehee's trial testimony that she had fled the house without witnessing the altercation between Florence and Mayberry. In response to this "total surprise," the trial court permitted the state to cross-examine Shehee using the prior inconsistent statements from her deposition. The state's theory of the case was consistent with Shehee's pretrial statements, and there is simply no basis to conclude that it knew these statements were false.
 {¶ 63} Florence further argues that, because the state knew of Shehee's unwillingness to testify at trial, it was aware that she "potentially could make alternative or different statements."[1]
Awareness of the potential for different testimony at trial is far different, however, from the knowing presentation of false testimony at trial. Moreover, it is clear that the state believed Shehee's pretrial version of events, rather than her trial testimony. As such, it did not present evidence that it knew to be false when it used Shehee's deposition testimony at trial.
 {¶ 64} Shehee presented two very different and inconsistent versions of events. Florence would like to hold this fact against the state, but there is no meritorious reason to do so. The state was clearly surprised by the change in Shehee's testimony. Under the circumstances presented, it was appropriate for the jury to weigh the credibility of Shehee's testimony
 {¶ 65} The fifth assignment of error is overruled.
 {¶ 66} VI. "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY EXCLUDING EVIDENCE OF THE PROSECUTING WITNESS' PROPENSITY OF CARRYING A GUN, IN VIOLATION OF APPELLANT'S RIGHT TO PRESENT A DEFENSE AND TO A FAIR TRIAL, WHICH RIGHTS ARE SECURED TO HIM BY THE DUE PROCESS CLAUSE OF THEFOURTEENTH AMENDMENT, AND ARTICLE 1, SECTION 16 OF THE OHIO CONSTITUTION."
 {¶ 67} Florence claims that the state should not have been permitted to present evidence that he "carried a weapon prior to the incident complained of" while prohibiting the introduction of such evidence about Mayberry.
 {¶ 68} The police recovered a Desert Eagle gun from the scene of the crime, where a police officer had observed Florence with something metallic in his hand and had heard the gun drop into the street alongside Florence just before he surrendered. The gun was described by police as large, heavy, powerful, Israeli-made, and somewhat unusual for a handgun. Forensics linked the gun found in the street with the casing found next to Mayberry's body. Mayberry's blood was found on the gun, and bruises on Mayberry's head matched the distinctive shape of the gun. Thus, there was no question at trial that the Desert Eagle was the gun that had killed Mayberry. The only uncertainly was who had brought the gun to the scene and how the events had unfolded.
 {¶ 69} At trial, the state asked Shehee whether she had ever seen the Desert Eagle before, and she denied that she had. She also denied ever having seen Florence with this gun. The state then attempted to impeach Shehee with her deposition testimony about the gun. Shehee admitted at trial that, in her deposition, she had stated that: 1) she recognized the gun; 2) she had identified it as a Desert Eagle; 3) she had identified it as the gun that Florence always had and took to work with him; and 4) she would recognize the gun if she saw it again. She then identified the gun in court.
 {¶ 70} Florence contrasts this testimony with defense counsel's attempt to elicit testimony about whether Mayberry had carried a gun. Defense counsel asked Shehee: "What weapons have you seen Mr. Mayberry carry?" The state objected and, after a sidebar, the jury was instructed to disregard the question. Florence claims that this evidence was "probative" and "admissible."
 {¶ 71} The state claims that, without evidence supporting a theory of self-defense, any evidence of Mayberry's propensity to carry a gun was irrelevant and prohibited by Evid.R. 404. With respect to Florence, however, the state argues that such evidence was permitted by Evid.R. 404(B) to show intent, opportunity, or lack of accident.
 {¶ 72} We take a slightly different approach to this analysis. In our view, evidence that the Desert Eagle belonged to Florence was admissible pursuant to Evid.R. 402 because it was relevant to the questions of whose gun was involved and who was the aggressor in the conflict between Mayberry and Florence. Because of its direct relevance to these issues, this testimony as to the ownership of the Desert Eagle was not character evidence with respect to Florence.
 {¶ 73} With respect to Mayberry, the state argues that evidence of carrying a gun was properly excluded under Evid.R. 404. However, it is arguable that such evidence was admissible under Evid.R. 404(A)(2) or Evid.R. 405(B) as a trait of character that was essential to Florence's defense. It is also arguable that such evidence was admissible under Evid.R. 406 as evidence of habit.
 {¶ 74} Assuming, for the sake of argument, that evidence regarding whether Mayberry was known to carry a weapon had been admitted at trial and that it would have been helpful to the defense, we are unpersuaded that such evidence would have affected the outcome of the trial. The police did not find another gun, or any other weapon, at the scene of the shooting. The physical evidence strongly suggests that Florence hit Mayberry with the Desert Eagle because Mayberry's bruises were consistent with the shape of the gun. Moreover, the jury was justifiably skeptical of Florence's claim that Mayberry had been shot in the back of the head during a struggle for the gun, and Florence was unable to explain how Mayberry's pants came to be pulled down. For all of these reasons, we conclude that even if Florence had been allowed to offer evidence that Mayberry often carried a gun or other weapon, such evidence would not have affected the outcome of the trial.
 {¶ 75} The sixth assignment of error is overruled.
 {¶ 76} The judgment of the trial court will be affirmed.
Grady, J. and Donovan, J., concur.
[1] A material witness warrant was required to secure Shehee's testimony at trial. After she had twice failed to appear, Shehee provided a sworn deposition to avoid being held in jail on the material witness warrant.